## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **MARY E. ALBERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **4:12CV3050** |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner).[1]  The plaintiff Mary E. Albers (Albers) appeals the Commissioner's decision denying Albers' applications for Disability Insurance (DI) benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401, *et seq.* and Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  Albers alleges she was disabled June 29, 2009, due to asthma, fibromyalgia, an aortic aneurism, diabetes, degenerative disc disease of the spine, and pain.  Albers filed a brief (Filing No. 16) in support of this administrative appeal.  The Commissioner filed the administrative record (AR.) (Filing Nos. 10 and 11) and a brief (Filing No. 21) in opposition of Albers' appeal for benefits.  Albers filed a brief (Filing No. 22) in reply.

## BACKGROUND

On January 20, 2009, Albers filed an application for benefits alleging her disability began August 31, 2008 (AR. 160).  Albers subsequently amended her alleged disability onset date to June 29, 2009 (AR. 150).  Albers alleged she was disabled due to asthma, fibromyalgia, an aortic aneurism, diabetes, degenerative disc disease of the spine, and myofascial pain syndrome (AR. 250).  The Commissioner denied benefits initially and on reconsideration (AR. 66, 78).  An Administrative Law Judge (ALJ) held a hearing on April 26, 2011 (AR. 30).  On May 6, 2011, the ALJ determined Albers was not disabled within

---

[1]  The parties consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  **See** Filing No. 15.

the meaning of the Act (AR. 8-21). Albers appealed the ALJ's determination. (AR. 7). The Appeals Council denied Albers' request for review (AR. 1-3). Albers now seeks judicial review of the ALJ's determination as it represents the final decision of the Commissioner.

Albers appeals the Commissioner's decision asking the decision be reversed and benefits awarded because: (1) the ALJ erred by rejecting Albers' testimony of intensity and persistence of her pain when objective evidence supported her testimony; (2) the ALJ erred finding Albers not credible; (3) the ALJ erred finding Albers could work based solely on the purported absence of objective evidence; (4) the ALJ failed to give appropriate weight to Albers' treating physicians' and the vocational expert's opinions; (5) the ALJ erred by applying the medical-vocational guidelines to Albers; (6) the ALJ erred by providing significant weight to the state agency's medical experts' opinions; (7) the ALJ's determination Albers is capable of unskilled, light work is not supported by substantial evidence on the record as a whole; (8) the Appeals Council failed to provide appropriate weight or consider additional evidence presented on appeal; and (9) the ALJ and the Appeals Council violated the Act by failing to consider the entire record. **See** Filing No. 16 - Brief p. 1-2. After reviewing the ALJ's decision, the parties' briefs, the record, and applicable law, the court finds the ALJ's ruling, that Albers was not disabled, is not supported by substantial evidence in the record as a whole.

## ADMINISTRATIVE RECORD

### A.    Medical Records

On July 7, 2004, Albers saw David A. Benavides, M.D. (Dr. Benavides), for low back pain (AR. 486-488). Albers stated she injured herself getting a patient out of a car during work and had pain in her lower back and legs (AR. 486). Dr. Benavides diagnosed low back pain resulting from a herniated disc with some radiculopathy (AR. 487). Dr. Benavides provided Albers with an epidural steroid injection that provided Albers with significant relief (AR. 488).

On August 13, 2006, Albers saw Michael Sullivan, M.D. (Dr. Sullivan), at Franklin County Memorial Hospital (Memorial Hospital) for pain in her upper body (AR. 350). Albers complained of a crushing, stabbing chest pain and a neck and shoulder ache (AR. 350).

Albers stated she was able to continue with her daily life activities (AR. 350).   Albers ranked her pain as an eight out of ten (AR. 350).   On physical exam, Dr. Sullivan noted Albers was well developed, well nourished, and appeared in mild pain (AR. 350).   Dr. Sullivan noted Albers' medical history included hypertension and myofascial pain syndrome (AR. 350).   Dr. Sullivan assessed Albers with a recurrent episode of myofascial pain syndrome and scheduled a follow-up appointment with another doctor (AR. 351).

Albers saw Dr. Sullivan again on October 27, 2006, for palpitations (AR. 352). Albers stated she gets short of breath when she has palpitation episodes (AR. 352).   Dr. Sullivan noted Albers' medical history included hypertension, myofascial pain syndrome, anxiety, and bipolar disorder (AR. 352).   On physical exam, Dr. Sullivan noted Albers was well developed, well nourished, and appeared in mild pain (AR. 352).   Albers reported that after taking Lorazepam and Lopressor she has not had any episodes of palpitations or shortness of breath (AR. 352).   Dr. Sullivan assessed Albers had resolved issues of palpitations and tachycardia and may have other issues related to stress and anxiety (AR. 353).

On February 17, 2007, Kearney County Community Hospital (Community Hospital) emergency room admitted Albers for a headache (AR. 378).   Eddie J. Pierce, M.D. (Dr. Pierce), was Albers' attending physician (AR. 378).   Dr. Pierce assessed Albers had an intractable headache, tobacco dependence, and teeth caries (AR. 378).   Dr. Pierce gave Albers a Toradol injection and recommended an ice pack to the head to relieve her headache (AR. 378).   Dr. Pierce also recommended Albers visit a dentist as soon as possible (AR. 378).   The following day, on February 18, 2007, Memorial Hospital admitted Albers for a migraine (AR. 331).   Albers was given Demerol and Phenergan injections and discharged in satisfactory condition (AR. 331).

On March 20, 2007, Memorial Hospital admitted Albers for nausea, numbness, and pain (AR. 321).   Albers was prescribed medication and discharged in satisfactory condition (AR. 321).   On April 9, 2007, Memorial Hospital admitted Albers for severe pain (AR. 319). The nurse prescribed medication for Albers' pain (AR. 319-320).   On July 31, 2007, Memorial Hospital admitted Albers for shoulder pain (AR. 317).   The attending nurse noted Albers had a steady gait with no grimacing or guarding (AR. 317).   The nurse diagnosed

shoulder pain and myofascial pain syndrome and prescribed Albers with Demerol and Phenergan injections (AR. 317).  Albers was discharged in satisfactory condition (AR. 317).

On January 20, 2008, Albers saw Paul M. Grow, M.D. (Dr. Grow), at the Kearney County Health Services (KCHS) emergency room for pain (AR. 380).  Dr. Grow noted Albers was alert, oriented, pleasant, and in no acute distress (AR. 380).  Dr. Grow assessed myofascial pain syndrome, prescribed Albers medication, and recommended she go home and follow-up with Albers' provider of choice (AR. 380).

On February 4, 2008, KCHS emergency room admitted Albers for pain (AR. 381).  Jori Becker, P.A. (Ms. Becker), attended Albers (AR. 381).  Albers reported she had pain in her shoulders, middle back, and neck (AR. 381).  Albers reported her usual medications were ineffective and Albers received injections in the past for treatment (AR. 381).  Ms. Becker noted Albers moved her upper extremities without difficulty although most of Albers' pain was in her upper body (AR. 381).  Ms. Becker discussed with Albers that the use of medications to treat pain increases the risk of developing tolerance and recommended other forms of treatment for pain management (AR. 381).  Ms. Becker provided Albers with Demerol and Phenergan injections (AR. 381).

On March 13, 2008, KCHS emergency room admitted Albers for pain (AR. 382).  Albers reported she no longer smoked (AR. 382).  Dr. Pierce noted her muscles seemed tense and Albers' head and neck had a diminished range of motion because of the pain (AR. 382).  Dr. Pierce diagnosed chronic pain syndrome and fibromyalgia (AR. 382).  After providing Albers an injection and medication, Dr. Pierce discharged Albers in an improved, stable condition (AR. 382).

On March 19, 2008, KCHS emergency room admitted Albers for pain (AR. 383).  Renee A. Grams, APRN (Ms. Grams), attended Albers (AR. 383-384).  Albers reported her pain was a deep burning or stabbing pain in her lower back and a slight, prickly pain in her arms and legs (AR. 383). Albers also reported she smoked one pack of cigarettes a day and occasionally walked her dog (AR. 383).  Ms. Grams noted Albers' gait was steady and Albers was able to maintain an upright sitting position without assistance (AR. 384).  Ms. Grams gave Albers an injection for the pain and discussed alternative treatments to manage the pain (AR. 384).

On September 22, 2008, KCHS emergency room admitted Albers for asthmatic bronchitis (AR. 388-389). Dr. Grow attended Albers (AR. 389). Albers was short of breath and had marked wheezing (AR. 388). Dr. Grow noted Albers smoked, but had not smoked in the two weeks prior to her admission to the emergency room (AR. 390). Dr. Grow noted Albers can do activities but should not work and should stay away from dust, smoke, and agricultural fumes (AR. 389). Dr. Grow provided Albers with medication and discharged Albers in a "much improved" conditional on September 23, 2008 (AR. 389).

On October 26, 2008, KCHS emergency room admitted Albers for shortness of breath, dizziness, and pain in her right arm, shoulder, elbow, rib, knee, and foot (AR. 398). Albers reported she had fallen three times on October 26, 2008 (AR. 398). The first time, Albers fell while walking in her house and had no pain after the fall (AR. 398). The second time, Albers fell while walking her dog outside and no pain was reported (AR. 398). The third time, Albers was walking outside, stepped off a curb, did a somersault, and woke up on the road in a water puddle (AR. 398). Albers reported she did not smoke (AR. 398). Albers was alert, oriented, and in no distress (AR. 398). Albers had no wheezing and no bruising or abrasions on her extremities (AR. 399). The attending nurse prescribed medication and discharged Albers (AR. 399).

On November 7, 2008, Albers saw Dr. Grow for asthmatic bronchitis (AR. 743). Dr. Grow noted he did not smell cigarette smoke on Albers (AR. 743). Dr. Grow assessed asthmatic bronchitis and prescribed Albers medication (AR. 743).

On November 24, 2008, Albers saw Dr. Kalpesh Ganatra, M.D. (Dr. Ganatra), at the Hastings Pulmonary & Sleep Clinic (AR. 364). Dr. Ganatra evaluated Albers for possible asthmatic bronchitis (AR. 364). Dr. Ganatra noted Albers had a history of smoking but quit in September 2008 (AR. 364). Albers reported ongoing symptoms of exertional shortness of breath (AR. 364). Albers reported she could walk one flight of stairs and up to three blocks without any difficulty (AR. 364). Albers stated she was sixty percent better than her condition in September 2008 (AR. 364). Dr. Ganatra noted Albers' history of diabetes, hypercholesterolemia, fibromyalgia, and tobacco abuse (AR. 364). Dr. Ganatra reviewed Albers' x-rays from September 19 and 22, 2008, and October 6, 2008, and noted there were no obvious pulmonary abnormalities (AR. 365). Dr. Ganatra's impression was "that

5

it is unclear [Albers] has any preexisting underlying pulmonary disease given [Albers'] extensive smoking with 2 packs of cigarette smoking for the last 28 years" (AR. 365).  Dr. Ganatra recommended Albers continue with her medication and schedule a pulmonary function test (AR. 365).

On December 9, 2008, Albers saw Dr. Ganatra for a pulmonary function test (AR. 367).  Dr. Ganatra concluded Albers had normal airflow, with possible asthma, and an aortic aneurysm (AR. 367).  On December 22, 2008, Albers saw Dr. Ganatra for a dilated ascending aorta (AR. 359).  Albers was listed as a cigarette smoker and had a persistent cough (AR. 360).  Dr. Ganatra concluded Albers had normal airflow, lung volumes, airway resistence, and a mild to moderate reduction in diffusion capacity (AR. 359).  Dr. Ganatra's impression was that Albers had an ascending thoracic aortic aneurysm (AR. 362, 373).

On December 30, 2008, KCHS emergency room admitted Albers for a headache rated at a nine out of ten (AR. 404).  Ms. Grams was the attending nurse (AR. 405).  Albers reported she smoked one to two cigarettes a day and did smoke one cigarette before her headache (AR. 404).  Ms. Grams provided Albers with medication and discharged Albers in stable condition (AR. 405).

On January 8, 2009, Albers saw James H. Wudel, M.D. (Dr. Wudel), at the Nebraska Heart Institute for a dilated ascending aorta (AR. 356).  Dr. Wudel noted Albers' medical history included myofascial pain syndrome, obesity, high cholesterol, diabetes, and Albers had a thirty year history of smoking, which was recently resolved (AR. 356).  Dr. Wudel noted Albers' lungs were normal and her heart rate had regular rate and rhythm (AR. 357).  Dr. Wudel recommended Albers continue with her medications and have a echocardiogram and computed tomography (AR. 357-358).

On January 13, 2009, Dr. Ganatra saw Albers for coughing, wheezing, and shortness of breath (AR. 369).  Dr. Ganatra's impression was that Albers had asthma though there was no evidence of airflow limitation (AR. 369).  Dr. Ganatra prescribed medication and scheduled a follow-up appointment (AR. 369).

On January 28, 2009, KCHS emergency room admitted Albers for severe neck discomfort (AR. 409).  The attending nurse discussed treatment options with Albers and

prescribed Albers medication (AR. 409).  Albers was told to follow-up with Douglas J. Althouse, M.D. (Dr. Althouse), the next day (AR. 409).

On January 29, 2009, Albers completed a Daily Activities and Symptoms Report (January 2009 Report) (AR. 260-264).  Albers reported her activities are limited and she tries to work four hours a day but her pain makes activities very hard (AR. 260).  Albers reported she was able to take care of her personal needs (AR. 260).  Albers does not do chores but can do dishes for fifteen minutes at a time before she has too much pain (AR. 260).  Albers tries to cook once a day (AR. 260).  Albers reported she can drive, but only for thirty-minute intervals (AR. 260).  Albers reported she walks four blocks to uptown twice a day, but not every day (AR. 261).  However, Albers also reported she can only walk three blocks before stopping to rest because of pain and breathing issues (AR. 261).  Albers reported she can sit and stand for up to one hour (AR. 261).

In the January 2009 Report, Albers listed she suffers from dizziness, shortness of breath, severe pain in her body, and fatigue (AR. 262).  The pain is located in her shoulders, collar bones, arms, legs, hips, and back (AR. 262).  Albers described her pain as pinching, aching, and throbbing (AR. 262).  Albers reported sometimes moving or changing positions makes the pain better (AR. 262).  Albers reported her symptoms occur every day and persists from eight to twelve hours a day to all day long (AR. 262).  Albers rated her pain on average as a six, one being mild pain and ten being severe pain (AR. 262).  Albers noted in addition to medication she takes to treat her symptoms, Albers takes hot showers, rests in a sitting position, or walks to relieve her symptoms (AR. 263-264).

On January 30, 2009, KCHS emergency room admitted Albers for generalized pain (AR. 410).  Albers took Vicodin, which did not work, and went to the emergency room for a Demerol injection (AR. 410).  The attending nurse assessed a fibromyalgia flare-up and provided Albers with Toradol and Vistaril injections (AR. 410).  The attending nurse recommended Albers follow-up with Dr. Althouse within a week (AR. 410).

On February 27, 2009, Denes Korpas, M.D. (Dr. Korpas), performed an echocardiography on Albers (Ar. 429).  Dr. Korpas concluded the right and left ventricles of Albers' heart were of normal size and function although there was a mild concentric left ventricular hypertrophy (AR. 429).  There was a mild enlargement of the left atrium and a

mild dilation of 3.9 centimeters at its largest diameter of the aortic root (AR. 429).  Dr. Korpas concluded all heart valves were normal (AR. 429).

On March 10, 2009, Albers saw Dr. Grow for pain (AR. 736-737).  Dr. Grow noted Albers smelled of cigarette smoke and her tobacco use was "ongoing and intermittent" (AR. 737).  Dr. Grow recommended Albers stop smoking completely and gave Albers a Toradol injection to treat her pain (AR. 736).

On March 13, 2009, Albers had a follow-up appointment with Dr. Ganatra for asthma (AR. 411).  Albers reported she has been working at Goodwill for about four hours a day and has had asthma attacks from exposure to dust, aerosol sprays, and dog hair (AR. 411).  Dr. Ganatra noted Albers had a history of tobacco abuse but was not currently smoking (AR. 411).  Dr. Ganatra recommended Albers avoid dusts and fumes and prescribed medication to manage her asthma (AR. 411).

On April 3, 2009, A. R. Hohensee, M.D. (Dr. Hohensee), completed a Physical Residual Functional Capacity Assessment (assessment) after reviewing Albers' medical records (AR. 415-421).  In the assessment, Dr. Hohensee noted Albers' primary diagnosis was myofascial pain syndrome with a secondary diagnosis of non-insulin-dependent diabetes mellitus (AR. 418).  Dr. Hohensee determined Albers could lift up to ten pounds frequently and up to twenty pounds occasionally, could stand and walk for about six hours in an eight-hour workday, could sit for about six hours in an eight-hour workday, and could push and pull with no limitations (AR. 415).  Dr. Hohensee also determined Albers could frequently balance and occasionally climb, stoop, kneel, crouch, and crawl (AR. 416).  Dr. Hohensee determined Albers has limited reaching abilities but no limitations in handling, fingering, and feeling (AR. 417).  Dr. Hohensee determined Albers does not have visual or communicative limitations (AR. 421-422).  Lastly, Dr. Hohensee determined Albers should avoid concentrated exposure to vibrations and extreme cold and heat (AR. 418).  Dr. Hohensee concluded Albers can have unlimited exposure to wetness, humidity, noise, hazards, fumes, odors, dusts, gases, and poor ventilation, etc. (AR. 418).

Dr. Hohensee concluded Albers does not have asthma although she smoked for twenty-eight years and had one episode of wheezing after corn dust exposure (AR. 421).  Dr. Hohensee also concluded there was no evidence in the record to support scoliosis or

8

degenerative spine disease (AR. 421). Dr. Hohensee noted Albers stated she has limited ability to sit and stand although she walks to the emergency room which is four blocks away to receive frequent injections (AR. 421). Dr. Hohensee noted Albers has well-controlled diabetes (AR. 421). Dr. Hohensee concluded Albers has impairments, but Albers appears capable of work (AR. 421). On July 10, 2009, Glen Knosp, M.D. (Dr. Knosp), reviewed Albers' records and affirmed Dr. Hohensee's April 3, 2009, assessment without additional comments (AR 432).

On April 24, 2009, KCHS emergency room admitted Albers for pain rated a twelve out of ten (AR. 431). Albers reported the pain was caused by moving her head quickly to avoid a bird (AR. 431). Albers reported the pain was sudden and severe and worsened during the day (AR. 431). Albers appeared alert and oriented but moderately distressed (AR. 431). Dr. Grow assessed musculoskeletal pain with spasm and gave Albers an injection (AR. 431).

On June 2, 2009, Albers saw Dr. Althouse for pain (AR. 532). Albers reported she used a mechanical "weed eat[er] a lot recently" (AR. 532). Dr. Althouse noted Albers was not in acute distress (AR. 532). Dr. Althouse provided Albers with a Toradol injection for her pain symptoms (AR. 532).

On June 29, 2009, David W. Swift, M.D. (Dr. Swift), examined Albers (AR. 451-454). Dr. Swift noted Albers did not have difficulty with activities of daily living (AR. 453). Dr. Swift noted Albers was coughing and wheezing but had no difficulty breathing and no asthma, bronchitis, pneumonia, or pleurisy (AR. 453). Dr. Swift noted Albers has myalgia and morning stiffness but no joint pain (AR. 453). Lastly, Dr. Swift noted Albers did not exhibit anxiety, depression, mood changes, or insomnia (AR. 453). Dr. Swift concluded Albers had fibromyalgia, myofascial pain syndrome, diabetes, and degenerative disc disease of the cervical and lumbar spine (AR. 451). Dr. Swift recommended Albers perform regular exercise and provided Albers with injections (AR. 451). Dr. Swift also completed a form to allow Albers to receive reimbursement for her auto insurance while she was unemployed and unable to work due to fibromyalgia and disc disease (AR. 451, 454).

Albers completed another Daily Activities and Symptoms Report on July 2, 2009 (July 2009 Report) (AR. 277-281).  Albers reported her activities, hobbies, errands, and ability to do chores and take care of herself was limited (AR. 277).  Albers reported she has very limited sleep, one to two hours at a time, and naps a lot (AR. 278).  Albers reported her ability to stand, climb stairs, and sit was limited (AR. 278).  Albers reported similar symptoms as in her January 2009 Report (AR. 279-280).

On August 6, 2009, KCHS emergency room admitted Albers for pain (AR. 493). Albers stated she had pain in her back for three days (AR. 493).  The attending nurse discussed treatment strategies and provided Albers with Demerol and Phenergan injections (AR. 493).

On September 28, 2009, Jorge L. Alvarez, M.D. (Dr. Alvarez), examined Albers for inhalation of corn dust on September 17, 2008 (AR. 455-456).  Dr. Alvarez noted Albers had a history of smoking but recently quit in September 2008 (AR. 456).  Dr. Alvarez assessed Albers had reactive airway disease associated with corn dust exposure (AR. 456).  Dr. Alvarez recommended Albers undergo allergy skin testing and use an inhaler daily (AR. 456-457).

On October 1, 2009, KCHS emergency room admitted Albers for pain (AR. 462). Albers reported she "smokes just a 'little'" (AR. 462).  Dr. Pierce assessed Albers had chronic pain syndrome, tobacco dependance, and diabetes mellitus type two (AR. 462). Dr. Pierce provided Albers with a Demerol injection in accordance with Albers' request (AR. 463).

On November 18, 2009, KCHS emergency room admitted Albers for pain (AR. 499-500).  The attending nurse, Ms. Grams, noted Albers used tobacco products (AR. 499). Ms. Grams also discussed alternative treatments to alleviate Albers' pain (AR. 500).  Ms. Grams provided Albers with Demerol and Phenergan injections and informed Albers she would need to see Dr. Althouse for further treatment (AR. 500).

On January 21, 2010, Bruce Albrecht, OTR/L, CWCE (Mr. Albrecht), evaluated Albers' physical performance capacity (AR. 466-482).  Mr. Albrecht noted Albers was able to drive from Minden to Kearney through icy conditions for forty-five minutes without having to stop due to pain (AR. 471).  Albers reported she can lift twenty pounds, carry ten

10

pounds, sit for fifteen to twenty minutes, and dynamically stand for forty-five minutes (AR. 473).  Albers reported she tries to walk downtown daily, which is about five blocks and takes thirty minutes (AR. 473).  Albers reported limited agility and dexterity (AR. 473).  Mr. Albrecht concluded Albers could do the following activities on an occasional basis:  sitting, static standing, dynamic standing, walking, stair climbing, crouching, forward reaching, overhead reaching, and kneeling with adjacent support (AR. 467).  Mr. Albrecht defined occasional as one to thirty-three percent of a workday (AR. 466).

On March 15, 2010, Dr. Swift completed a Medical Source Statement for Albers (AR. 484).  Dr. Swift noted he last evaluated Albers on June 29, 2009, and Albers had fibromyalgia, myofascial pain syndrome, and degenerative disc disease (AR. 484).  Dr. Swift limited Albers to 2.67 hours or less of sitting in an eight-hour workday (AR. 484).  Dr. Swift noted Albers can lift up to twenty-five pounds occasionally and carry twenty pounds (AR. 484).  Dr. Swift noted Albers was unable to perform substantial gainful employment as of June 29, 2009, when Dr. Swift evaluated Albers and Albers was "already off work" (AR. 485).  Dr. Swift gave Albers a fair prognosis (AR. 485).

On April 14, 2010, Albers saw Amy S. Uridll, APRN (Ms. Uridll), for a follow-up exam (AR. 540).  Ms. Uridll noted Albers was not feeling well although Albers has been compliant with medication (AR. 540).  Ms. Uridll noted Albers walked occasionally and rode her bike, but does not perform routine exercises (AR. 540).  Ms. Uridll noted Albers joined a health club and started exercises, which Albers reported did not help (AR. 540).  Ms. Uridll provided Albers with injections to treat Albers' pain (AR. 542).

On April 16, 2010, KCHS emergency room admitted Albers for pain (AR. 502).  Dr. Grow noted Albers smoked in the past, but did not know if Albers smoked at the time of evaluation (AR. 502).  Dr. Grow assessed Albers with fibromyalgia and gave her a Demerol injection (AR. 502).  On May 4, 2010, KCHS emergency room admitted Albers for pain (AR. 504).  Dr. Althouse gave Albers a Toradol injection and recommended Albers see a physical therapist for evaluation (AR. 504).

On February 7, 2011, Albers saw Dr. Swift for a follow-up appointment (AR. 537, 550).  Dr. Swift noted Albers "feels well with minor complaints" and was "getting along fairly well recently" but with increased discomfort in certain regions (AR. 550).  Dr. Swift noted

11

he "continued to fill out the bank forms to defer some of her payments while she is unable to work" (AR. 550).  Dr. Swift diagnosed myofascial pain syndrome, trochanteric bursitis, degenerative disc disease in the lumbar and cervical spine, diabetes, and fibromyalgia (AR. 550).  Dr. Swift provided Albers with injections for the pain (AR. 550).

On March 30, 2011, Dr. Swift completed a progress statement as part of an insurance form for Central States Health & Life Company of Omaha (AR. 750).  Dr. Swift opined Albers was "totally disabled from degenerative disc disease, myofascial pain syndrome, and fibromyalgia" (AR. 750).  Dr. Swift noted Albers was restricted in bending, lifting, and stooping (AR. 750).  Dr. Swift completed a similar statement on June 29, 2009 (AR. 751).

In addition to Albers' visits to emergency rooms and various doctor appointments, Albers, from September 15, 2005, to August 5, 2011, sought treatment for pain related symptoms at the Kearney County Medical Clinic (AR. 509-759).  Generally the doctors and nurses discussed treatment options and provided Albers with Toradol, Demerol, or Phenergan injections to treat Albers' pain (AR. 509-759).


**B.      Administrative Hearing**

At the administrative hearing on April 26, 2011, Albers testified she was fifty years old, 5'6", and 210 pounds (AR. 35, 55).  Albers' highest level of education was the twelfth grade (AR. 35).  Albers lives with her seventy-seven-year-old mother who takes care of Albers (AR. 35, 40).  Albers testified that in the morning she wakes up around 7:30 a.m. to 8:00 a.m. and sometimes her mother has to help Albers get out of bed because Albers is stiff and sore (AR. 40).  Albers will eat breakfast and eat again at 11:00 a.m. or 11:30 a.m. and by 1:00 p.m. Albers is ready to take a nap (AR. 40).

Albers' most recent employment was with Monsanto Feed, a grain company, in December 2008 (AR. 35).  Prior to Monsanto Feed, Albers worked at Morris Krass riveting books for three months (AR. 53).  As a riveter Albers would lift fifteen to twenty pound boxes and could sit or stand during work (AR. 54).  Prior to Morris Krass, Albers worked as a nurse for the elderly (AR. 53).  Albers testified she cannot perform any of her past employment (AR. 53-54).

12

In 2009, Albers filed a claim for worker's compensation due to an injury sustained at Monsato Feed (AR. 35).  The claim settled in February 2010 and Albers collected $59,500 (AR. 35).  Albers also collected unemployment in 2009 and 2010 (AR. 35).  Albers collected the following unemployment:  $110 in the second quarter of 2009; $2067 in the third quarter of 2009; $1942 in the fourth quarter of 2009; $1903 in the first quarter of 2010; and $834 in the second quarter of 2010 (AR. 36).  In order to receive unemployment, Albers agreed she was required to inform Nebraska she was "ready, willing and able to work." (AR. 36).  Albers testified even though she had to be "ready, willing and able to work," she still was disabled as of June 29, 2009, because should could only work under certain restrictions (AR. 36).  Albers testified she could not work around dust, chemical, fumes, or perfumes because of her breathing issues (AR. 37-38).  When Albers applied for unemployment benefits she advised the Department of Labor of her work restrictions (AR. 41).  Albers testified she looked for employment when she applied for unemployment benefits (AR. 44).

Albers testified she was never offered any employment that accommodated her restrictions (AR. 44).  Albers testified if, at the time of the hearing, she were offered employment within Albers' restrictions, she would not be able to work because she has too much pain (AR. 44-45).  Albers testified she is unemployed and unable to work because she has fibromyalgia, serious ongoing back issues, diabetes, myofascial pain syndrome, and an aortic aneurism (AR. 35, 39).  Albers has pain "usually over [her] whole body, [her] arms, [her] legs, [her] back, even in [her] pelvic area" (AR. 45).  Albers testified the pain is a constant stabbing and aching pain and because of the pain, Albers no longer does cooking, laundry, or shopping (AR. 40, 45, 47-48).  Albers can only drive in thirty minute intervals (AR. 40).  Albers cannot use a computer because of the pain in her hands (AR. 45).  The pain also causes Albers headaches for which she uses migraine strength Tylenol to treat (AR. 46).

Albers testified her stamina and energy is "no good" (AR. 47).  Albers testified she cannot sit or stand for long periods of time and mostly lies down because her back causes her pain (AR. 40).  Albers can sit comfortably for twenty minutes before changing position or standing (AR. 45-46).  Albers can stand comfortably for about ten minutes before

13

changing positions (AR. 48-49).  Standing is difficult because Albers may lose her balance when she loses feeling in her legs (AR. 48).  Albers testified she has trouble sleeping and sometimes sleeps for three hours before moving to a recliner or a couch to sleep another two to three hours (AR. 49).

Albers testified Dr. Swift first diagnosed Albers with fibromyalgia in the "first part of '09 somewhere in there" (AR. 41).  Albers testified she had a CT scan in November 2010, that showed degenerative disc disease (AR. 42).  Albers takes a steady volume of pain pills and a pain patch, specifically Fentanyl 12.5 micrograms, for her back pain (AR. 43).  Albers also received an epidural steroid injection in November 2010 and February 2011 for her back pain (AR. 43).  Although a doctor recommended Albers attend a pain clinic, she is financially unable to attend (AR. 47-48).  Albers testified she has been treated at the emergency room for pain (AR. 51).  Albers testified she underwent a functional capacity evaluation in January 2010 (AR. 52).  After the evaluation, Albers felt worn out from the standing, sitting, lifting, and other activities (AR. 52).

Albers testified she suffers from diabetes (AR. 49).  Sometimes her blood sugar will spike to above four hundred and drop as low as twenty at which time Albers has difficulty functioning (AR. 49).  Albers takes medication to control her diabetes (AR. 49).  Albers testified she suffers from depression and takes medication to alleviate her depression symptoms (AR. 50).  Albers still has problems with depression even while on medication (AR. 50-51).  Albers testified her condition has worsened since she applied for benefits. (AR. 43).  Albers used to mow the lawn but now it takes too long and Albers gets tired (AR. 43-44).  Albers can no longer go shopping or clean the house (AR. 44, 52).  Albers testified she does not smoke "very much at all . . . as a matter of fact [she] pretty well ended it." (AR. 38).  Albers then testified she smokes nothing now because she has breathing difficulties (AR. 38).

Alyssa Smith, a vocational expert (VE), testified in response to the ALJ's hypothetical questions outlining Albers' age, education, and work experience (AR. 55-60).  The ALJ limited hypothetical individual number one to performing light exertion level work with occasional climbing of stairs and ramps but not ropes, ladders, or scaffolds, and occasional stooping, kneeling, crouching, and crawling (AR. 56).  Additionally, the

individual would have to avoid exposure to pulmonary irritants, unprotected heights, excessive vibration, and hazardous machinery (AR. 56). The VE testified individual one could not perform past relevant work (AR. 56). However, the VE testified individual one could work in the national and regional economy (AR. 56). Specifically, individual one could function as a routing clerk, silverware wrapper, and price marker at the light exertional level (AR. 41-42). The VE testified there are 2420 jobs as a routing clerk in Nebraska and 78,370 jobs in the United States; 1125 jobs as a silverware wrapper in Nebraska and 217,120 in the United States; and 2875 jobs as a price marker in Nebraska and 461,500 in the United States (AR. 56-57).

The ALJ limited hypothetical individual number two to the same limitations as individual one with two additions: handling that is gross manipulation is limited to frequent, not constant, and individual two is limited to unskilled work (AR. 57). The VE testified the job as a silverware wrapper would be eliminated but individual two could perform work as a routing clerk and price marker (AR. 57). Additionally, the VE testified individual two could perform work as a collator operator which has 531 jobs in Nebraska and 118,450 in the United States (AR. 57).

The ALJ limited hypothetical individual number three to the same limitations as individual two with several additions: individual three is limited to performing sedentary exertion level work; can never climb; and only occasionally kneel, crouch, and crawl (AR. 58). The VE testified individual three could perform work as an document preparer, which has 162 jobs in Nebraska and 23,640 in the United States, and a dowel inspector, which has 230 jobs in Nebraska and 16,500 in the United States (AR. 58).

The ALJ limited hypothetical individual number four to the same limitations as individual two but with several additions: the job must allow for occasional, unscheduled disruptions in the work day and work week and allow for the necessity to lie down for extended periods of time (AR. 58-59). Further, individual four has an inability to concentrate or focus for eight hours in an eight-hour work day, is unreliable for showing up to work; and suffers from potential effects of medication (AR. 58-59). The VE testified there was no work for individual four in the economy (AR. 59). The VE testified the

information provided is consistent with the Dictionary of Occupational Titles (DOT) (AR. 59).

Albers' attorney asked the VE whether hypothetical individual number two with the additional limitation of occasional sitting, static standing, dynamic standing, walking, stair climbing, crouching, partial squatting, forward reaching, and overhead reaching could work in the national economy (AR. 59). Albers' attorney defined occasional as 2.67 hours in an eight-hour workday (AR. 59). The VE testified individual two with the added limitations could not work in the national economy (AR. 60).

## THE ALJ'S DECISION

The ALJ concluded Albers was not disabled under the Act and was not entitled to any disability benefits (AR. 11-21). The ALJ framed the issue as whether Albers was disabled under §§ 216(i), 223(d), and 1614(a)(3)(A) of the Act (AR. 11). The ALJ defined disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or last for a continuous period of not less than twelve months (AR. 11). See 42 U.S.C. § 423; 20 C.F.R. § 404.1505. The ALJ determined Albers met the insured status requirements of the Act (AR. 13).

The ALJ must evaluate a disability claim according to the sequential five-step analysis established by the Social Security regulations. See 20 C.F.R. § 404.1520(a)-(f); *Phillips v. Astrue*, 671 F.3d 699, 701 (8th Cir. 2012).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. See 20 C.F.R. § 404.1520(a). If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments

16

> (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience.  If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy.   A claimant's residual functional capacity is a medical question.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (internal citations omitted).  "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled."  *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citation omitted); **see** *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010).

In this case, the ALJ followed the appropriate sequential analysis.  At step one, the ALJ found Albers had not engaged in substantial gainful activity since August 31, 2008 (AR. 13).  At step two, the ALJ determined Albers had the following severe impairments: possible fibromyalgia, degenerative disc disease, diabetes mellitus, obesity, and asthma (AR. 13).  The ALJ noted the listed impairments have more than minimal effect on Albers' ability to engage in work-related activities (AR. 13).  The ALJ determined Albers' aortic aneurism has less than minimal affect on Albers' ability to engage in work-related activities and is non-severe based on Albers' testimony and lack of treatment (AR. 13).  The ALJ also determined Albers' depression is non-severe and has less than a minimal affect on Albers' ability to engage in work-related activities (AR. 13-14).  The ALJ determined Albers has mild restrictions on her activities of daily living, mild difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation (AR. 14).

At the third step, the ALJ determined Albers does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926) (AR. 14).  The ALJ noted Albers' obesity does not meet the criteria for a musculoskeletal impairment because Albers does not have an extreme limitation in her ability to walk or perform fine and gross movements and does

17

not have nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis (AR. 14). The ALJ noted Albers does have some slight spondylosis and degenerative changes to her spine, but no evidence of nerve root compression (AR. 14).  The ALJ also noted Albers' asthma and diabetes mellitus do not meet the requirements of SSA Listing[2] 3.03 and 9.08, respectively (AR. 14).  The ALJ considered Albers' fibromyalgia within the framework of Listing 14.02 and determined Albers' condition does not meet the requirements of the Listing (AR. 14).  Before proceeding to step four of the sequential evaluation process, the ALJ determined Albers' ability to perform work-related functions, or a residual functional capacity, is limited to the following:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can never climb ropes, ladders, or scaffolds.  The claimant can occasionally climb ramps and stairs.  The claimant can occasionally stoop, kneel, crouch and crawl.  The claimant is limited to frequent, not constant, handling.  The claimant should avoid concentrated exposure to excessive vibration, pulmonary irritants, hazardous machinery, and unprotected heights.  The claimant is limited to unskilled work only.

(AR. 15).

The ALJ determined Albers' medically determinable impairments could reasonably be expected to cause some of Albers' alleged symptoms, but Albers' statements concerning the intensity, persistence, and limiting effects of the alleged symptoms were not fully credible (AR. 17).  The ALJ noted two factors weighed against Albers' credibility (AR. 17).  First, the ALJ noted Albers' reports of allegedly limited daily activities have not been objectively verified with any reasonable degree of certainty (AR. 17).  Second, the ALJ noted even if Albers' daily activities are limited as alleged, the ALJ found it difficult to attribute the degree of limitation to Albers' medical condition, as opposed to other reasons, such as life style choices (AR. 17).

The ALJ found Albers had significant activities throughout her alleged period of disability which were inconsistent with a completely disabled individual (AR. 17).  The ALJ

---

[2] The Listing of Impairments describes, for each major body system, impairments considered severe enough to prevent an individual from doing any gainful activity. **See** http://www.ssa.gov/disability/professionals/bluebook/listing-impairments.htm.

noted Albers performed lawn work and used a weed eater machine while allegedly having back pain (AR. 17). On April 14, 2010, Dr. Swift indicated Albers joined a health club, started to exercise, walked occasionally, and rode her bike (AR. 17). Dr. Swift encouraged Albers to pursue regular aerobic exercise thirty minutes a day, five days a week (AR. 17). On May 11, 2010, Dr. Althouse advised Albers to spend less time riding a lawn mower (AR. 17).

The ALJ determined the overall record shows Albers' near-sedentary existence is self-imposed rather than the result of a disabling impairment or combination of impairments (AR. 17-18). The ALJ concluded although Albers sought medical treatment on multiple occasions by multiple treating sources, the records do not support the allegations of disabling impairments (AR. 18). The ALJ noted the only other opinions which place limitations on Albers' ability to work were her physician's suggestion in Albers' worker's compensation case that Albers cannot return to her past work (AR. 18). The ALJ concluded neither the objective medical evidence nor Albers' testimony establish her ability to function has been so severely impaired as to preclude all types of work activity (AR. 18). The ALJ noted Dr. Swift's February 7, 2011, opinion wherein Dr. Swift noted Albers "feels well with minor complaint [and] she has been getting along fairly well recently" and Albers has normal gait and station (AR. 18) (**citing** Ex. 23F). The ALJ also noted inconsistencies in Albers' testimony regarding smoking (AR. 18). The ALJ determined Albers' credibility is reduced as a result of these inconsistencies (AR. 18).

The ALJ gave significant weight to the state agency consultants Drs. Knosp and Hohensee wherein the doctors opined Albers has the ability to perform light exertional level work (AR. 18). The ALJ gave Dr. Swift's and Mr. Albrecht's opinions significant weight (AR. 18). The ALJ noted Dr. Swift's March 15, 2010, opinion and Mr. Albrecht's opinion support the conclusion Albers is able to perform light exertional work with minimal limitations (AR. 18). The ALJ gave no weight to Dr. Swift's remaining opinions (AR. 18). Further, the ALJ noted although Albers received a favorable decision on her worker's compensation claim, such a decision is not binding upon the SSA due to differing standards for finding disability (AR. 19).

19

At step four of the sequential evaluation process, the ALJ determined Albers is unable to perform her past relevant work (AR. 19).  At the final step in the process, the ALJ determined jobs exist in significant numbers in the national economy that Albers can perform (AR. 19-20).  The ALJ relied upon the VE's testimony finding a person of Albers' age, education, work experience, and RFC could perform light, unskilled work as a routing clerk, collator operator, and price marker (AR. 20).  The ALJ determined that because Albers could perform unskilled light labor and jobs existed in significant numbers in the national economy, Albers was not disabled (AR. 20).

## STANDARD OF REVIEW

A district court is authorized jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g), **see also** 42 U.S.C. § 1383(c)(3).  A district court is to affirm the Commissioner's findings if "supported by substantial evidence on the record as a whole." *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011).  Substantial evidence is defined as less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.  *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010); **see also** *Minor v. Astrue*, 574 F.3d 625, 627 (8th Cir. 2009) (noting "the 'substantial evidence on the record as a whole' standard requires a more rigorous review of the record than does the 'substantial evidence' standard").  "If substantial evidence supports the decision, then [court] may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error." *Nettles v. Schweiker*, 714 F.2d 833, 835-36 (8th Cir. 1983).  The court reviews questions of law *de novo*.  **See** *Miles v. Barnhart*, 374 F.3d 694, 698 (8th Cir. 2004).  Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole.  **See** *Nettles*, 714 F.2d at 835; *Renfrow v. Astrue*, 496 F.3d 918, 920 (8th Cir. 2007).  Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578.

**DISCUSSION**

**A.    Appeals Council's Failure to Review**

Albers argues the Appeals Council erred by declining to review the ALJ's determination because the determination was not supported by substantial evidence.  **See** Filing No. 16 - Brief p. 26.  Albers also argues the Appeals Council's failure to consider additional evidence of Albers' medical condition violated the Act.  **Id.** at 25-26.

Under the Social Security Regulations:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970; **see** *Whitney v. Astrue*, 668 F.3d 1004, 1006 (8th Cir. 2012).  "To be new, evidence must be more than merely cumulative of other evidence on the record." *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008).  "[E]vidence is material if it is 'relevant to claimant's condition for the time period for which benefits were denied.'"  *Id.* (**quoting** *Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th Cir. 2000)).  "The Appeals Council's failure to consider the evidence 'may be a basis for remand by a reviewing court.'"  *Whitney*, 668 F.3d at 1006 (**quoting** *Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995)).

The Appeals Council, in denying Albers' request to review the ALJ's decision, considered Albers' arguments and the additional evidence presented.  **See** Filing No. 10-2 - Notice of Appeals Council Action p.1.  The Appeals Council specifically noted Albers' additional evidence was considered and "found that this information does not provide a basis for changing the Administrative Law Judge's decision."  *Id.* at 1, 4.  Accordingly, this court does not review the Appeals Council's decision to consider the evidence or deny review of the case.  **See** *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007); *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994).  Similar to the Appeals Council's appraisal of the case, this court will uphold the ALJ's decision if supported by substantial evidence in

the record as a whole, including the additional evidence submitted.  See *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

**B.    Albers' Credibility and Absence of Objective Medical Evidence**

Albers argues the ALJ's rejection of Albers' testimony regarding the intensity and persistence of her pain was not supported by substantial evidence on the record as a whole because there was objective evidence of pain.  See Filing No. 16 - Brief p. 6.  Albers argues the record is replete with Albers' pain complaints and she has been prescribed a plethora of medications and treatments to control her pain.  *Id.* at 9.  Albers argues objective medical records document Albers' chronic pain.  *Id.* at 9-10.  Additionally, Albers argues substantial evidence on the record as a whole does not support the ALJ's determination that Albers is not credible.  *Id.* at 11.  Albers argues the ALJ did not properly discuss why the ALJ did not find Albers credible.  *Id.* at 12.  Albers argues the ALJ focused on a few isolated, anomalous statements to determine Albers' credibility.  *Id.*  Albers also argues engaging in limited activities when her pain is not too severe does not constitute substantial evidence of Albers' ability to perform daily activities.  *Id.* at 14.  Further, Albers argues the ALJ misconstrued Albers' testimony regarding smoking.  *Id.* at 17-18.  Lastly, Albers argues the ALJ's finding regarding Albers' ability to work was improperly based solely on the purported absence of objective evidence.  *Id.* at 18.

In assessing credibility, an ALJ must consider the following *Polaski* factors:  "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness, and side effects of medication; precipitating and aggravating factors; and functional restrictions."  *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009) (**citing** *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "The ALJ is not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting a claimant's subjective complaints."  *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012).  "Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence."  *Halverson v. Astrue*, 600 F.3d 922,

931-32 (8th Cir. 2010). "A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question." *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [courts] will normally defer to the ALJ's credibility determination." *Renstrom*, 680 F.3d at 1065.

The ALJ determined Albers' impairments could reasonably be expected to cause some of her alleged symptoms, but Albers' statements concerning the intensity, persistence, and limiting effects of her symptoms are not fully credible. The ALJ, as Albers suggests, did not make a single, conclusory statement with respect to Albers' credibility. Instead, the ALJ properly discussed reasons for finding Albers' subjective complaints incredible. The ALJ cited two factors in support of the ALJ's credibility determination: Albers' subjective reports of limited daily activities have not been objectively verified with any reasonable degree of certainty and Albers' degree of limitation is not fully attributable to Albers' medical condition but reflects a self-imposed life style (AR. 17). The ALJ noted Albers was able to use a lawn mower and weed eater (AR. 17). The ALJ noted Albers walked occasionally and rode her bike (AR. 17). The ALJ also noted Dr. Swift's recent assessment on February 7, 2011, wherein Dr. Swift opined Albers, even though Dr. Swift noted Albers had increased discomfort in certain regions, "feels well with minor complaints" and was "getting along fairly well recently" (AR. 18, 550). Thus, even with Albers reporting increased discomfort, Dr. Swift noted Albers had minor complaints (AR. 550).

In addition to evidence the ALJ specifically referenced, evidence of other activities in the medical record supports the ALJ's determination. For example, there is evidence in the record that Albers was able to walk her dog during her alleged disability (AR. 383, 398). Albers reported, as of January 2010, she walked downtown daily (AR. 473). Further, during exam on June 29, 2009, Dr. Swift noted Albers did not have difficulty with activities of daily living (AR. 453).

The ALJ also discussed Albers' tobacco abuse (AR. 18). The ALJ concluded Albers' inconsistent testimony with regard to smoking reduced Albers' credibility (AR. 18).

23

The ALJ noted as of 2009 Albers smoked and records indicated in 2011 that Albers was tobacco dependent (AR. 18).  The ALJ noted a change in Albers testimony wherein Albers initially testified she smoked "not very much at all" but then testified she smoked "nothing" (AR. 38-39).  Albers' medical records also show she was inconsistent in informing doctors about her smoking habits.  On March 13, 2008, Albers stated she did not smoke (AR. 382).  Days later on March 19, 2008, Albers stated she smoked one pack a day (AR. 383).  On October 26, 2008, Albers again stated she did not smoke and on November 7, 2008, the doctor noted Albers did not smell of smoke (AR. 398, 743).  However, on December 9, 2008, Albers was listed as a smoker and on December 30, 2008, Albers stated she smoked one or two cigarettes a day (AR. 360, 404).  On March 10, 2009, Albers smelled of smoke and was listed as an intermittent smoker (AR. 737).  On October 1, 2009, Albers stated she smoked just a little (AR. 462).  These inconsistencies provide the ALJ with a basis to conclude Albers lacked credibility.  Although Albers may have made efforts to quit smoking, her inconsistent testimony regarding smoking nevertheless reasonably reduced her credibility in the ALJ's opinion.

The ALJ recognized Albers sought medical treatment on multiple occasions.  However, the ALJ determined Albers lacked credibility, a determination substantial evidence on the record as a whole supports.  Further, the ALJ relied on more than the mere lack of objective evidence to determine Albers' ability to work.  The ALJ considered the lack of objective evidence supporting Albers' complaints, in conjunction with inconsistencies and other evidence in the record, in determining Albers' credibility.  **See *Tennant v. Apfel*, 224 F.3d 869, 871 (8th Cir. 2000)** ("[T]he ALJ properly relied on . . . the lack of objective medical evidence.").  Although evidence may exist to support Albers' arguments, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court ***must*** affirm the ALJ's decision."  ***Halverson***, 600 F.3d at 929 (citation omitted) (emphasis added).  The evidence in the record before the court reasonably supports the ALJ's decision to discredit Albers.

### C.    Physicians' Opinions and RFC

Albers argues the ALJ's RFC determination is not supported by substantial evidence on the record as a whole.  **See** Filing No. 16 - Brief p. 23.  Albers argues the ALJ selectively included portions of medical reports that imply Albers is capable of competitive employment.  *Id.* at 24.  Albers argues the ALJ improperly ignored portions of opinions, to which he gave significant weight, that conflict with the ALJ's RFC determination.  *Id.*  Albers argues the ALJ erred in discounting Dr. Swift's and Mr. Albrecht's opinions that Albers is unable to sit for more than 2.67 hours in an eight-hour work day.  *Id.* at 21.  Albers argues the ALJ should have given Dr. Swift's and Mr. Albrecht's opinions greater weight over Drs. Hohensee's and Knosp's opinions because the medical evidence supported Dr. Swift's and Mr. Albrecht's opinions.  *Id.* 19.  Albers argues Drs. Hohensee's and Knosp's opinions conflict with the record as a whole.  *Id.* at 20-21.  Albers argues Dr. Knosp's opinion merely "rubber stamps" Dr. Hohensee's opinion.  *Id.* at 20.

In order to have a valid RFC, there must be substantial evidence on the record as a whole to support the ALJ's RFC determination.  *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009).  Substantial evidence is relevant evidence a reasonable mind would accept as adequate to support a decision.  *Id.*  RFC is the most the claimant can still do despite physical and mental limitations based on the evidence in the record.  20 C.F.R. § 404.1545(a)(1).  In addition to the relevant medical evidence, the ALJ bases the RFC assessment on the relevant non-medical evidence including the claimant's statements.  **See** 20 C.F.R. § 404.1545(a)(3).  When there are inconsistencies in the claimant's testimony, the ALJ may properly discount part of the testimony.  *Id.*  Additionally, the ALJ may discount conclusions from a medical expert or treating physician if the conclusions are inconsistent with the record as a whole.  *Teague v. Astrue*, 638 F.3d 611, 615-616 (8th Cir. 2011).

A treating physician's opinion is generally given greater weight if it is consistent with other substantial evidence and medically accepted clinical and laboratory diagnoses support the opinion.  *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011).  However, "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole."  *Id.*  The treating physician's opinion may be discounted or disregarded by the ALJ when the credibility of the treating physician's opinion is undermined by the physician's own

inconsistent opinions or the opinion is inconsistent with the medical evidence as a whole. *Halverson*, 600 F.3d at 931; **see also** *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) ("An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes.").  "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (**quoting** *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

The ALJ attributed significant weight to four opinions.  The ALJ gave significant weight to Drs. Hohensee's and Knosp's assessments.  The ALJ also gave significant weight to Dr. Swift's Medical Source Statement and Mr. Albrecht's Physical Performance Evaluation.  The court finds Dr. Swift's and Mr. Albrecht's opinions conflict with the ALJ's RFC.  Additionally, Drs. Hohensee's and Knosp's opinions do not constitute substantial evidence on the record as a whole to support the ALJ's RFC.

The ALJ concluded Dr. Swift's and Mr. Albrecht's opinions demonstrate Albers is able to perform light exertional work (AR. 18).  However, after reviewing the opinions and additional evidence in the record, the opinions do not appear to support the ALJ's conclusion.  On January 21, 2010, Mr. Albrecht evaluated Albers' physical performance capacity (AR. 466-482).  Mr. Albrecht concluded Albers could do the following activities on an occasional basis:  sitting, static standing, dynamic standing, walking, stair climbing, crouching, forward reaching, overhead reaching, and kneeling with adjacent support (AR. 467).  Mr. Albrecht defined occasional as one to thirty-three percent of a workday (AR. 466).  On March 15, 2010, Dr. Swift limited Albers to 2.67 hours or less of sitting in an eight-hour workday (AR. 484).  Dr. Swift noted Albers can lift up to twenty-five pounds occasionally and carry twenty pounds (AR. 484).  Dr. Swift gave Albers a fair prognosis (AR. 485).

The ALJ accorded Dr. Swift's March 15, 2010, and Mr. Albrecht's January 21, 2010, opinions significant weight.  The ALJ did not note any internal consistencies or contradictory medical opinions that would lead the ALJ to disregard the limitations established in Dr. Swift's and Mr. Albrecht's opinions.  The ALJ also did not discredit Dr. Swift's and Mr. Albrecht's definitions of an "occasional" limitation.  Therefore, if the ALJ

provided the opinions significant weight, and not discredit any portion of the opinions, it stands that the ALJ adopted the limitations listed by Dr. Swift and Mr. Albrecht.  The ALJ cannot ignore the limitations Dr. Swift and Mr. Albrecht listed and draw different and inconsistent conclusions from their opinions.  **See *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)** ("An administrative law judge may not draw upon his own inferences from medical reports.").   Using the limitations Dr. Swift and Mr. Albers established, Albers' attorney asked the VE whether an individual limited to occasional sitting, static standing, dynamic standing, walking, stair climbing, crouching, partial squatting, forward reaching, and overhead reaching could work in the national economy (AR. 59-60).  Dr. Swift and Mr. Albrecht defined occasional as up to 2.67 hours in an eight-hour workday or one to thirty-three percent of a workday.  The VE testified such an individual ***could not*** work in the national economy (AR. 60).  The ALJ's conclusion that Dr. Swift's and Mr. Albrecht's opinions support the finding Albers can do light exertional work is inconsistent with Dr. Swift's, Mr. Albrecht's, and the VE's opinions.

In addition to Dr. Swift's and Mr. Albrecht's opinions, the ALJ relied on non-treating, non-examining physicians' opinions, specifically, Drs. Hohensee and Knosp.  Albers originally alleged her disability began August 31, 2008 (AR. 160).  Albers subsequently amended her alleged disability onset date to June 29, 2009.  (AR. 150).  In between that time, on April 3, 2009, Dr. Hohensee completed an assessment based on the evidence in Albers' file (AR. 414).  Just after the June 29, 2009, onset day, Dr. Knosp completed his assessment on July 10, 2009, which merely affirmed Dr. Hohensee's pre-onset review and assessment (AR. 432).  The only additional evidence Dr. Knosp noted he considered was Albers' April 24, 2009, visit to a doctor for an injury sustained when avoiding a bird (AR. 432).  The court finds no difference between the opinions.  The ALJ concluded Drs. Hohensee's and Knosp's opinions support the determination Albers is "able to essentially perform light exertional work" (AR. 18).  However, Dr. Hohensee generated his opinion prior to Albers' amended onset date and, although Dr. Knosp generated his opinion after the amended onset date, Dr. Knosp's opinion merely relied on Dr. Hohensee's opinion and pre-onset record review.

Additionally, Dr. Hohensee's report conflicts with the ALJ's opinion.  Dr. Hohensee noted Albers does not have asthma and there is no evidence of degenerative disc disease (AR. 421).  Dr. Hohensee also opined Albers may have unlimited exposure to fumes, odors, dusts, gases, and poor ventilation (AR. 421).  In contrast, the ALJ determined Albers has severe impairments resulting from asthma and degenerative disc disease (AR. 13).  The ALJ also determined Albers should avoid concentrated exposure to pulmonary irritants (AR. 15).  Although the ALJ is entitled to consider all evidence in the record and Drs. Hohensee's and Knosp's opinions support the ALJ's RFC, their opinions, alone, do not constitute substantial evidence on the record as a whole particularly when the other evidence of record does not support their opinions during the relevant time period under consideration.  See **_Nevland_**, 204 F.3d at 858 ("The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole.").

The ALJ's RFC is not supported by substantial evidence on the record as a whole. Dr. Swift's and Mr. Albrecht's opinions were accorded significant weight, yet the limitations within were disregarded without reason or on the basis of conflicting medical evidence. Drs. Hohensee's and Knosp's opinions contradict the ALJ's determination and are not supported by medical evidence in the record.

## C.    ALJ's Hypothetical Question to the Vocational Expert

Albers argues the ALJ erred in applying the medical-vocational guidelines to an individual who cannot perform the full range of light work.  See Filing No. 16 - Brief p. 21-22.  Albers argues her limitations were primarily the result of pain, therefore the use of the medical-vocational guidelines was improper and the ALJ was required to rely on the VE's testimony.  **_Id._** at 23.  Additionally, Albers argues the ALJ's hypothetical question to the VE omitted Dr. Swift's opinion limiting Albers to sitting 2.67 hours or less in an eight-hour work day.  **_Id._** at 22.  Albers argues the ALJ also omitted Mr. Albrecht's opinion limiting Albers to occasional sitting, static standing, dynamic standing, and walking.  **_Id._**  Albers argues when Albers' sitting and standing limitations were included in a hypothetical question to the VE, the VE testified there are no jobs which Albers could perform.  **_Id._**  22-23.

28

An ALJ's hypothetical question to the VE constitutes substantial evidence when it includes all the claimant's credible impairments.  *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010).  The ALJ may rely on vocational expert testimony as "substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies."  *Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2010).

The testimony the ALJ seems to adopt from the VE was based on limitations set forth in Drs. Hohensee's and Knosp's opinions.  The VE's testimony based on limitations from those opinions does not constitute substantial evidence.  **See** *Nevland*, 204 F.3d at 858 ("[T]he testimony of a vocational expert who responds to a hypothetical based on [opinions of doctors who have not examined the claimant] is not substantial evidence upon which to base a denial of benefits.").  The ALJ disregarded the VE's testimony in response to Albers' attorney's hypothetical question that included the limitations set forth in Dr. Swift's and Mr. Albrecht's opinions, although the ALJ accorded significant weight to their opinions without limitation.  Therefore, a portion of the VE's testimony appears supported by evidence in the record as a whole and could constitute substantial evidence. Nevertheless, because the ALJ unexplainedly disregarded portions of Dr. Swift's and Mr. Albrecht's opinions and disregarded the VE's testimony in response to Albers' attorney's hypothetical question, the portion of the VE's testimony adopted by the ALJ does not constitute substantial evidence to support the ALJ's conclusion.

## CONCLUSION

Accordingly, for the reasons stated herein, and based on the entirety of the record, the Commissioner's denial of benefits is reversed and remanded.   Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (internal citation omitted).   In the absence of overwhelming evidence necessary for this court to award benefits, and "out of our abundant deference to the ALJ," the proper course is to remand this matter for further proceedings consistent with this opinion because the record evidence should be clarified and properly evaluated.  *Id.*  On remand, the Commissioner is directed

to:  (1) clarify the discrepancies in the ALJ's decision and Dr. Swift's and Mr. Albrecht's opinions; (2) further develop the record with consultative examinations and testing relevant to the time of Albers' disability; (3) clarify the VE's testimony regarding "occasional" limitations; and (4) issue a new decision based on substantial evidence of the record as a whole.

**IT IS ORDERED:**

The Commissioner's decision is remanded in accordance with this opinion.


DATED this 21st day of December, 2012.

BY THE COURT:

 s/ Thomas D. Thalken
United States Magistrate Judge